Khaled EL–MASRI, Plaintiff–
Appellant,

v.

UNITED STATES of America,
Intervenor–Appellee,

and

George J. Tenet; Premier Executive Transport Services; Keeler & Tate Management Group, LLC; Aero Contractors, Limited; Does 1–20, Defendants.

Morton Abramowitz; F. Allen "Tex" Harris; William C. Harrop; Sam Hart; Edward L. Peck; William D. Rogers; Pierre Shostal; E. Michael Southwick; Ward Thompson; Peter Wolcott, Former United States Diplomats, Amici Supporting Appellant.

No. 06–1667.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 28, 2006.

Decided March 2, 2007.

**ARGUED:** Ben Wizner, American Civil Liberties Union, New York, New York, for Appellant. Gregory George Katsas, United States Department of Justice, Civil Division, Appellate Section, Washington, D.C., for Appellee. **ON BRIEF:** Ann Beeson, Melissa Goodman, American Civil Liberties Union, New York, New York; Victor M. Glasberg, Victor M. Glasburg & Associates, Alexandria, Virginia; Paul Hoffman, Schonbrun, Desimone, Seplow, Harris & Hoffman, Venice, California; Rebecca Glenberg, American Civil Liberties Union of Virginia, Richmond, Virginia, for Appellant. Peter D. Keisler, Assistant Attorney General, Jeffrey S. Bucholtz, Principal Deputy Assistant Attorney General, Douglas Letter, Terrorism Litigation, H. Thomas Byron, III, Attorney, Appellate Staff, United States Department of Justice, Washington, D.C.; John A. Rizzo, Acting General, Central Intelligence Agency, Washington, D.C.; Chuck Rosenberg, United States Attorney, R. Joseph Sher, Assistant United States Attorney, Dennis C. Barghaan, Jr., Assistant United States Attorney, Larry Lee Gregg, Assistant United States Attorney, Office of the United States Attorney, Alexandria, Virginia, for Appellee. Sidney S. Rosdeitcher, David M. Cave, Colin McNary, Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P., New York, New York; Aziz Huq, Brennan Center for Justice at NYU School of Law, New York, New York, for Amici Supporting Appellant.

Before KING, SHEDD, and DUNCAN, Circuit Judges.

_Affirmed by published opinion. Judge KING wrote the opinion, in which Judge SHEDD and Judge DUNCAN joined._

KING, Circuit Judge.

Khaled El–Masri appeals from the dismissal of his civil action against former Director of Central Intelligence George Tenet, three corporate defendants, ten unnamed employees of the Central Intelligence Agency (the "CIA"), and ten unnamed employees of the defendant corporations.[1] In his Complaint in the Eastern District of Virginia, El–Masri alleged that the defendants were involved in a CIA operation in which he was detained and interrogated in violation of his rights under the Constitution and international law. The United States intervened as a defendant in the district court, asserting that El–Masri's civil action could not proceed because it posed an unreasonable

---

1. The corporate defendants named in El–Masri's Complaint are Premier Executive Transport Services, Inc., which the Complaint describes as doing business in Massachusetts; Keeler and Tate Management LLC, described as doing business in Nevada; and Aero Contractors Limited, described as doing business in North Carolina. _See_ Complaint ¶¶ 9–11. The Complaint is found at J.A. 9–34. (Citations herein to "J.A. ——" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

risk that privileged state secrets would be disclosed. By its Order of May 12, 2006, the district court agreed with the position of the United States and dismissed El–Masri's Complaint. *See El–Masri v. Tenet*, 437 F.Supp.2d 530, 541 (E.D.Va.2006) (the "Order"). On appeal, El–Masri contends that the district court misapplied the state secrets doctrine and erred in dismissing his Complaint. As explained below, we affirm.

## I.

### A.

On December 6, 2005, El–Masri, a German citizen of Lebanese descent, filed his Complaint in this case, alleging, in substance, as follows: on December 31, 2003, while travelling in Macedonia, he was detained by Macedonian law enforcement officials; after twenty-three days in Macedonian custody, he was handed over to CIA operatives, who flew him to a CIA-operated detention facility near Kabul, Afghanistan; he was held in this CIA facility until May 28, 2004, when he was transported to Albania and released in a remote area; and Albanian officials then picked him up and took him to an airport in Tirana, Albania, from which he travelled to his home in Germany. The Complaint asserted that El–Masri had not only been held against his will, but had also been mistreated in a number of other ways during his detention, including being beaten, drugged, bound, and blindfolded during transport; confined in a small, unsanitary cell; interrogated several times; and consistently prevented from communicating with anyone outside the detention facility, including his family or the German government. El–Masri alleged that his detention and interrogation were

> carried out pursuant to an unlawful policy and practice devised and implemented by defendant Tenet known as "ex-

traordinary rendition": the clandestine abduction and detention outside the United States of persons suspected of involvement in terrorist activities, and their subsequent interrogation using methods impermissible under U.S. and international laws.

Complaint ¶ 3.

According to the Complaint, the corporate defendants provided the CIA with an aircraft and crew to transport El–Masri to Afghanistan, pursuant to an agreement with Director Tenet, and they either knew or reasonably should have known that "Mr. El–Masri would be subjected to prolonged arbitrary detention, torture and cruel, inhuman, or degrading treatment in violation of federal and international laws during his transport to Afghanistan and while he was detained and interrogated there." Complaint ¶ 61. El–Masri also alleges that CIA officials "believed early on that they had the wrong person," and that Director Tenet was notified in April 2004 that "the CIA had detained the wrong person" in El–Masri. *Id.* ¶ 43.

The Complaint alleged three separate causes of action. The first claim was against Director Tenet and the unknown CIA employees, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), for violations of El–Masri's Fifth Amendment right to due process. Specifically, El–Masri contends that Tenet and the defendant CIA employees contravened the Due Process Clause's prohibition against subjecting anyone held in United States custody to treatment that shocks the conscience or depriving a person of liberty in the absence of legal process. El–Masri's second cause of action was initiated pursuant to the Alien Tort Statute (the "ATS"), and alleged that each of the defendants had

contravened the international legal norm against prolonged arbitrary detention. The third cause of action was also asserted under the ATS, and maintained that each defendant had violated international legal norms prohibiting cruel, inhuman, or degrading treatment.

On March 8, 2006, the United States filed a Statement of Interest in the underlying proceedings, pursuant to 28 U.S.C. § 517, and interposed a claim of the state secrets privilege.[2] The then Director of the CIA, Porter Goss, submitted two sworn declarations to the district court in support of the state secrets privilege claim. The first declaration was unclassified, and explained in general terms the reasons for the United States' assertion of privilege. The other declaration was classified; it detailed the information that the United States sought to protect, explained why further court proceedings would unreasonably risk that information's disclosure, and spelled out why such disclosure would be detrimental to the national security (the "Classified Declaration"). Along with its Statement of Interest, the United States filed a motion to stay the district court proceedings pending resolution of its privilege claim; the next day, March 9, 2006, the court granted the requested stay. On March 13, 2006, the United States formally moved to intervene as a defendant in the district court proceedings. Contemporaneous with seeking to intervene as a defendant, the United States moved to dismiss the Complaint, contending that its interposition of the state secrets privilege precluded the litigation of El–Masri's causes of action.

El–Masri responded that the state secrets doctrine did not necessitate dismissal of his Complaint, primarily because CIA rendition operations, including El–Masri's alleged rendition, had been widely discussed in public forums. In support of this contention, Steven Macpherson Watt, a human rights adviser to the American Civil Liberties Union, filed a sworn declaration in the district court, dated April 7, 2006, in which he asserted that United States officials—including Secretary of State Condoleezza Rice, White House Press Secretary Scott McClellan, and Directors Tenet and Goss—had publicly acknowledged that the United States had conducted renditions.[3] Watt also observed that international human rights organizations had issued statements on various United States rendition operations, including El–Masri's alleged rendition, and that at least one such release had described the use of privately owned aircraft in the renditions of El–Masri and others. Additionally, according to Watt, the European Parliament and the Council of Europe had commenced investigations into possible European cooperation in United States renditions, and similar inquiries were pending in eighteen European countries.

Watt further asserted that "[m]edia reports on the rendition program generally, and Mr. El–Masri's rendition specifically, are too numerous to assemble." Watt Declaration ¶ 26. According to Watt, these media reports revealed the existence of secret CIA detention facilities where some rendition subjects were held, as well as the United States' "modus operandi" for conducting renditions: "masked men in an unmarked jet seize their target, cut off his clothes, put him in a blindfold and jump-

---

**2.** Pursuant to 28 U.S.C. § 517, "any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States."

**3.** The Watt Declaration is found in the Joint Appendix at J.A. 191–210.

suit, tranquilize him and fly him away." *Id.* ¶ 26(vi). And, Watt represented, the news media had documented some of the details of El–Masri's alleged rendition, including the underlying "decision-making process" and the roles of the German and Macedonian governments. *Id.* ¶ 26(viii).

On May 12, 2006, after receiving the parties' memoranda and declarations, and after oral argument of the matter, the district court concluded that the claim of the state secrets privilege was valid, and that, "given the application of the privilege to this case, the United States' motion to dismiss must be ... granted." *See* Order, 437 F.Supp.2d at 541. El–Masri has appealed from the Order and corresponding judgment of dismissal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

### B.

■ We review de novo a district court's "legal determinations involving state secrets," including its decision to grant dismissal of a complaint on state secrets grounds. *Sterling v. Tenet,* 416 F.3d 338, 342 (4th Cir.2005).

### C.

In the period after the district court's dismissal of El–Masri's Complaint, his alleged rendition—and the rendition operations of the United States generally—have remained subjects of public discussion. In El–Masri's view, two additions to the body of public information on these topics are especially significant in this appeal. First, on June 7, 2006, the Council of Europe released a draft report on alleged United States renditions and detentions involving the Council's member countries. This report concluded that El–Masri's account of his rendition and confinement was substantially accurate. Second, on September 6, 2006, in a White House address, President Bush publicly disclosed the existence of a CIA program in which suspected terrorists are detained and interrogated at locations outside the United States. The President declined, however, to reveal any of this CIA program's operational details, including the locations or other circumstances of its detainees' confinement.

### II.

El–Masri maintains on appeal that the district court misapplied the state secrets doctrine in dismissing his Complaint without requiring any responsive pleadings from the defendants or permitting any discovery to be conducted. Importantly, El–Masri does not contend that the state secrets privilege has no role in these proceedings. To the contrary, he acknowledges that at least some information important to his claims is likely to be privileged, and thus beyond his reach. But he challenges the court's determination that state secrets are so central to this matter that any attempt at further litigation would threaten their disclosure. As explained below, we conclude that the district court correctly assessed the centrality of state secrets in this dispute. We therefore affirm its Order and the dismissal of El–Masri's Complaint.

### A.

#### 1.

■ Under the state secrets doctrine, the United States may prevent the disclosure of information in a judicial proceeding if "there is a reasonable danger" that such disclosure "will expose military matters which, in the interest of national security, should not be divulged." *United States v. Reynolds,* 345 U.S. 1, 10, 73 S.Ct. 528, 97 L.Ed. 727 (1953). *Reynolds,* the Supreme Court's leading decision on the state secrets privilege, established the doctrine in its modern form. There, an Air Force B–

29 bomber had crashed during testing of secret electronic equipment, killing three civilian observers who were on board. Their widows sued the United States under the Federal Tort Claims Act, and they sought discovery of certain Air Force documents relating to the crash. The Air Force refused to disclose the documents and filed a formal "Claim of Privilege," contending that the plane had been on "a highly secret mission of the Air Force," and that disclosure of the requested materials would "seriously hamper[ ] national security, flying safety and the development of highly technical and secret military equipment." *Id.* at 4–5, 73 S.Ct. 528.

The Court sustained the Air Force's refusal to disclose the documents sought by the plaintiffs, concluding that the officials involved had properly invoked the "privilege against revealing military secrets." 345 U.S. at 6–7, 73 S.Ct. 528. This state secrets privilege, the Court observed, was "well established in the law of evidence." *Id.* The Court relied in part on Greenleaf's classic evidence treatise, which traced the recognition of a privilege for state secrets to the 1807 treason trial of Aaron Burr. *See* I Simon Greenleaf & John Henry Wigmore, *A Treatise on the Law of Evidence* § 251 n.5 (16th ed. 1899); *United States v. Burr,* 25 F. Cas. 30, 37 (Marshall, Circuit Justice, C.C.D. Va. 1807) (No. 14,692D) (observing that, in appropriate circumstances, government may refuse to disclose confidential state matters in judicial proceedings). The *Reynolds* Court also reviewed a long line of decisions, both American and English, that had recognized and refined a privilege for state secrets. These included *Totten v. United States,* where, in 1875, the Supreme Court affirmed the dismissal of an action for breach of a secret espionage contract, concluding that "public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated." 92 U.S. 105, 107, 23 L.Ed. 605 (1875).

■ Although the state secrets privilege was developed at common law, it performs a function of constitutional significance, because it allows the executive branch to protect information whose secrecy is necessary to its military and foreign-affairs responsibilities. *Reynolds* itself suggested that the state secrets doctrine allowed the Court to avoid the constitutional conflict that might have arisen had the judiciary demanded that the Executive disclose highly sensitive military secrets. *See* 345 U.S. at 6, 73 S.Ct. 528. In *United States v. Nixon,* the Court further articulated the doctrine's constitutional dimension, observing that the state secrets privilege provides exceptionally strong protection because it concerns "areas of Art. II duties [in which] the courts have traditionally shown the utmost deference to Presidential responsibilities." 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). The *Nixon* Court went on to recognize that, to the extent an executive claim of privilege "relates to the effective discharge of a President's powers, it is constitutionally based." *Id.* at 711, 94 S.Ct. 3090. Significantly, the Executive's constitutional authority is at its broadest in the realm of military and foreign affairs. The Court accordingly has indicated that the judiciary's role as a check on presidential action in foreign affairs is limited. *See, e.g., Jama v. Immigration & Customs Enforcement,* 543 U.S. 335, 348, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005) (recognizing judiciary's "customary policy of deference to the President in matters of foreign affairs"); *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948) (prescribing limited judi-

cial role in foreign policy matters, especially those involving "information properly held secret"). Moreover, both the Supreme Court and this Court have recognized that the Executive's constitutional mandate encompasses the authority to protect national security information. *See Dep't of the Navy v. Egan,* 484 U.S. 518, 527, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) (observing that "authority to protect [national security] information falls on the President as head of the Executive Branch and as Commander in Chief"); *United States v. Marchetti,* 466 F.2d 1309, 1315 (4th Cir.1972) ("Gathering intelligence information and the other activities of the [CIA], including clandestine affairs against other nations, are all within the President's constitutional responsibility for the security of the Nation as the Chief Executive and as Commander in Chief of our Armed forces."). The state secrets privilege that the United States has interposed in this civil proceeding thus has a firm foundation in the Constitution, in addition to its basis in the common law of evidence.

### 2.

 A court faced with a state secrets privilege question is obliged to resolve the matter by use of a three-part analysis. At the outset, the court must ascertain that the procedural requirements for invoking the state secrets privilege have been satisfied. Second, the court must decide whether the information sought to be protected qualifies as privileged under the state secrets doctrine. Finally, if the subject information is determined to be privileged, the ultimate question to be resolved is how the matter should proceed in light of the successful privilege claim.

### a.

 The procedural requirements for invoking the state secrets privilege are set forth in *Reynolds,* which derived them largely from prior decisions on the subject. First, the state secrets privilege must be asserted by the United States. *See* 345 U.S. at 7, 73 S.Ct. 528. It "belongs to the Government and ... can neither be claimed nor waived by a private party." *Id.* Second, "[t]here must be a formal claim of privilege, lodged by the head of the department which has control over the matter." *Id.* at 7–8, 73 S.Ct. 528. Third, the department head's formal privilege claim may be made only "after actual personal consideration by that officer." *Id.* at 8, 73 S.Ct. 528. *Reynolds* emphasized that the state secrets privilege "is not to be lightly invoked," and the foregoing constraints on its assertion give practical effect to that principle. *Id.* at 7, 73 S.Ct. 528.

### b.

 After a court has confirmed that the *Reynolds* procedural prerequisites are satisfied, it must determine whether the information that the United States seeks to shield is a state secret, and thus privileged from disclosure. This inquiry is a difficult one, for it pits the judiciary's search for truth against the Executive's duty to maintain the nation's security. The *Reynolds* Court recognized this tension, observing that "[j]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers"—no matter how great the interest in national security—but that the President's ability to preserve state secrets likewise cannot be placed entirely at the mercy of the courts. 345 U.S. at 9–10, 73 S.Ct. 528. Moreover, a court evaluating a claim of privilege must "do so without forcing a disclosure of the very thing the privilege is designed to protect."

 The *Reynolds* Court balanced those concerns by leaving the judiciary

firmly in control of deciding whether an executive assertion of the state secrets privilege is valid, but subject to a standard mandating restraint in the exercise of its authority. A court is obliged to honor the Executive's assertion of the privilege if it is satisfied, "from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged." *Reynolds,* 345 U.S. at 10, 73 S.Ct. 528. In assessing the risk that such a disclosure might pose to national security, a court is obliged to accord the "utmost deference" to the responsibilities of the executive branch. *Nixon,* 418 U.S. at 710, 94 S.Ct. 3090. Such deference is appropriate not only for constitutional reasons, but also practical ones: the Executive and the intelligence agencies under his control occupy a position superior to that of the courts in evaluating the consequences of a release of sensitive information. In the related context of confidentiality classification decisions, we have observed that "[t]he courts, of course, are ill-equipped to become sufficiently steeped in foreign intelligence matters to serve effectively in the review of secrecy classifications in that area." *United States v. Marchetti,* 466 F.2d 1309, 1318 (4th Cir.1972). The executive branch's expertise in predicting the potential consequences of intelligence disclosures is particularly important given the sophisticated nature of modern intelligence analysis, in which "[t]he significance of one item of information may frequently depend upon knowledge of many other items of information," and "[w]hat may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context." *Id.* In the same vein, in those situations where the state secrets privilege has been invoked because disclosure risks impairing our foreign relations, the President's assessment of the diplomatic situation is entitled to great weight.

■ ▌ The Executive bears the burden of satisfying a reviewing court that the *Reynolds* reasonable-danger standard is met. A court considering the Executive's assertion of the state secrets privilege, however, must take care not to "forc[e] a disclosure of the very thing the privilege is designed to protect" by demanding more information than is necessary. *Reynolds,* 345 U.S. at 8, 73 S.Ct. 528. Frequently, the explanation of the department head who has lodged the formal privilege claim, provided in an affidavit or personal declaration, is sufficient to carry the Executive's burden. *See, e.g., Sterling v. Tenet,* 416 F.3d 338, 345 (4th Cir.2005) (relying on declarations of CIA Director); *Reynolds,* 345 U.S. at 5, 73 S.Ct. 528 (relying on Claim of Privilege by Secretary of Air Force and affidavit of Air Force Judge Advocate General). In some situations, a court may conduct an in camera examination of the actual information sought to be protected, in order to ascertain that the criteria set forth in *Reynolds* are fulfilled. *See Sterling,* 416 F.3d at 345. The degree to which such a reviewing court should probe depends in part on the importance of the assertedly privileged information to the position of the party seeking it. *See Reynolds,* 345 U.S. at 11, 73 S.Ct. 528. "Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted. . . ." *Id.* On the other hand, "even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake." *Id.* Indeed, in certain circumstances a court may conclude that an explanation by the Executive of why a question cannot be answered would itself create an unacceptable danger of injurious disclosure. *See id.* at 9, 73

S.Ct. 528. In such a situation, a court is obliged to accept the executive branch's claim of privilege without further demand. *See id.*

 After information has been determined to be privileged under the state secrets doctrine, it is absolutely protected from disclosure—even for the purpose of in camera examination by the court. On this point, *Reynolds* could not be more specific: "When ... the occasion for the privilege is appropriate, ... the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers." 345 U.S. at 10, 73 S.Ct. 528. Moreover, no attempt is made to balance the need for secrecy of the privileged information against a party's need for the information's disclosure; a court's determination that a piece of evidence is a privileged state secret removes it from the proceedings entirely. *See id.* at 11, 73 S.Ct. 528.

c.

 The effect of a successful interposition of the state secrets privilege by the United States will vary from case to case. If a proceeding involving state secrets can be fairly litigated without resort to the privileged information, it may continue. But if " 'the circumstances make clear that sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters,' dismissal is the proper remedy." *Sterling,* 416 F.3d at 348 (quoting *DTM Research, LLC v. AT & T Corp.,* 245 F.3d 327, 334 (4th Cir.2001)). The Supreme Court has recognized that some matters are so pervaded by state secrets as to be incapable of judicial resolution once the privilege has been invoked. *See Totten,* 92 U.S. at 107; *Reynolds,* 345 U.S. at 11 n. 26, 73 S.Ct.

528. Although *Totten* has come to primarily represent a somewhat narrower principle—a categorical bar on actions to enforce secret contracts for espionage—it rested, as we have already observed, on the proposition that a cause cannot be maintained if its trial would inevitably lead to the disclosure of privileged information. *See* 92 U.S. at 107. And in *Reynolds,* while concluding that dismissal was unnecessary because the privileged information was peripheral to the plaintiffs' action, the Court made clear that where state secrets form the very subject matter of a court proceeding, as in *Totten,* dismissal at the pleading stage—"without ever reaching the question of evidence"—is appropriate. *See* 345 U.S. at 11 n. 26, 73 S.Ct. 528. In a recent decision unanimously reaffirming *Totten's* validity, the Supreme Court approvingly quoted *Reynolds's* discussion of *Totten* as a matter in which dismissal on the pleadings was appropriate because the very subject matter of the action was a state secret. *See Tenet v. Doe,* 544 U.S. 1, 9, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005).

Our own decisions applying the state secrets privilege have also recognized that, in certain proceedings, the unavailability of privileged state secrets as evidence will necessarily lead to dismissal. In *Farnsworth Cannon, Inc. v. Grimes,* an action alleging tortious interference with a classified contract to perform services for the Navy, our en banc Court affirmed the district court's dismissal on state secrets grounds. *See* 635 F.2d 268 (4th Cir.1980). We reasoned that privileged secrets were so central to the dispute that "[i]n an attempt to make out a prima facie case during an actual trial, the plaintiff and its lawyers would have every incentive to probe as close to the core secrets as the trial judge would permit." *Id.* at 281. "Such probing in open court," we conclud-

ed, "would inevitably be revealing," and dismissal was therefore warranted. *Id.*

In *Fitzgerald v. Penthouse International, Ltd.*, in 1985, we affirmed the district court's dismissal, under the state secrets doctrine, of an action alleging that a magazine article on the Navy's classified marine mammal program had libelously accused the plaintiff of espionage. *See* 776 F.2d 1236, 1237–38 (4th Cir.1985). There, the Secretary of the Navy had filed a public declaration asserting that the plaintiff's plan to call witnesses with knowledge of the Navy's classified program risked the disclosure of military secrets, since those witnesses could be questioned about the secret information to which they were privy. *See id.* at 1242. In addition, the Secretary filed a separate, classified declaration that elaborated on his reasons for asserting the state secrets privilege in the case. *See id.* at 1243 n. 9. From all the circumstances, we concluded that "there was simply no way this particular case could be tried without compromising sensitive military secrets," and ruled that the district court had not erred in dismissing it. *Id.* at 1243.

More recently, in our 2005 *Sterling* decision, we affirmed the dismissal of a Title VII action initiated by an African–American CIA officer alleging unlawful discriminatory practices by CIA management. *See* 416 F.3d at 341. We concluded that state secrets were so central to that proceeding that it could not be litigated given the Executive's invocation of the privilege. *Id.* at 346–48. The evidence in the dispute would have consisted primarily of documents and testimony regarding the assignments and performance evaluations of CIA operatives, and many of the necessary witnesses were individuals whose very identities were state secrets. *Id.* at 347–48. Indeed, as Judge Wilkinson explained, "the whole object of the suit and of the

discovery [was] to establish a fact that is a state secret—namely, the methods and operations of the Central Intelligence Agency." *Id.* at 348 (internal quotation marks and citation omitted). In those circumstances, dismissal was deemed appropriate.

Our sister circuits have likewise recognized that the unavailability of privileged information may, in some instances, necessarily lead to dismissal. *See Kasza v. Browner*, 133 F.3d 1159, 1170 (9th Cir. 1998) (affirming dismissal, on state secrets grounds, of action alleging that Air Force had unlawfully handled hazardous waste in classified operating area); *Black v. United States*, 62 F.3d 1115, 1118–19 (8th Cir. 1995) (affirming dismissal, on state secrets grounds, of action alleging that executive branch officials had engaged in "campaign of harassment and psychological attacks" against plaintiff); *Bareford v. Gen. Dynamics Corp.*, 973 F.2d 1138, 1140 (5th Cir.1992) (affirming dismissal, on state secrets grounds, of action alleging manufacturing and design defects in military weapons system); *Halkin v. Helms*, 690 F.2d 977, 981 (D.C.Cir.1982) (affirming dismissal, on state secrets grounds, of action alleging unlawful CIA surveillance); *cf. Tenenbaum v. Simonini*, 372 F.3d 776, 777–78 (6th Cir.2004) (affirming summary judgment because no defense was available without resort to privileged state secrets).

### 3.

To summarize, our analysis of the Executive's interposition of the state secrets privilege is governed primarily by two standards. First, evidence is privileged pursuant to the state secrets doctrine if, under all the circumstances of the case, there is a reasonable danger that its disclosure will expose military (or diplomatic or intelligence) matters which, in the interest of national security, should not be di-

vulged. *See Reynolds,* 345 U.S. at 10, 73 S.Ct. 528. Second, a proceeding in which the state secrets privilege is successfully interposed must be dismissed if the circumstances make clear that privileged information will be so central to the litigation that any attempt to proceed will threaten that information's disclosure. *See Sterling,* 416 F.3d at 348; *see also Reynolds,* 345 U.S. at 11 n. 26, 73 S.Ct. 528; *Totten,* 92 U.S. at 107. With these controlling principles in mind, and being cognizant of the delicate balance to be struck in applying the state secrets doctrine, we proceed to our analysis of El–Masri's contentions.

### B.

#### 1.

The question before us is whether the facts of this proceeding satisfy the governing standard for dismissal of an action on state secrets grounds, as the district court ruled.[4] El–Masri essentially accepts the legal framework described above. He acknowledges that the state secrets doctrine protects sensitive military intelligence information from disclosure in court proceedings, and that dismissal at the pleading stage is appropriate if state secrets are so central to a proceeding that it cannot be litigated without threatening their disclosure. El–Masri contends, however, that the facts that are central to his claim are not state secrets, and that the district court thus erred in dismissing his Complaint.

#### a.

] The heart of El–Masri's appeal is his assertion that the facts essential to his Complaint have largely been made public, either in statements by United States officials or in reports by media outlets and foreign governmental entities. He maintains that the subject of this action is simply "a rendition and its consequences," and that its critical facts—the CIA's operation of a rendition program targeted at terrorism suspects, plus the tactics employed therein—have been so widely discussed that litigation concerning them could do no harm to national security. Appellant's Br. 38. As a result, El–Masri contends that the district court should have allowed his case to move forward with discovery, perhaps with special procedures imposed to protect sensitive information.

 El–Masri's contention in that regard, however, misapprehends the nature of our assessment of a dismissal on state secrets grounds. The controlling inquiry is not whether the general subject matter of an action can be described without resort to state secrets. Rather, we must ascertain whether an action can be *litigated* without threatening the disclosure of such state secrets. Thus, for purposes of the state secrets analysis, the "central facts" and "very subject matter" of an action are those facts that are essential to prosecuting the action or defending against it.

El–Masri is therefore incorrect in contending that the central facts of this proceeding are his allegations that he was detained and interrogated under abusive conditions, or that the CIA conducted the rendition program that has been acknowledged by United States officials. Facts such as those furnish the general terms in which El–Masri has related his story to the press, but advancing a case in the court of public opinion, against the United

---

**4.** El–Masri does not dispute that the procedural requirements for asserting the state se-

crets privilege have been satisfied here.

States at large, is an undertaking quite different from prevailing against specific defendants in a court of law. If El–Masri's civil action were to proceed, the facts central to its resolution would be the roles, if any, that the defendants played in the events he alleges. To establish a prima facie case, he would be obliged to produce admissible evidence not only that he was detained and interrogated, but that the defendants were involved in his detention and interrogation in a manner that renders them personally liable to him. Such a showing could be made only with evidence that exposes how the CIA organizes, staffs, and supervises its most sensitive intelligence operations. With regard to Director Tenet, for example, El–Masri would be obliged to show in detail how the head of the CIA participates in such operations, and how information concerning their progress is relayed to him. With respect to the defendant corporations and their unnamed employees, El–Masri would have to demonstrate the existence and details of CIA espionage contracts, an endeavor practically indistinguishable from that categorically barred by *Totten* and *Tenet v. Doe. See Totten v. United States*, 92 U.S. 105, 107, 23 L.Ed. 605 (1875) (establishing absolute bar to enforcement of confidential agreements to conduct espionage, on ground that "public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential"); *Tenet v. Doe*, 544 U.S. 1, 10–11, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005) (reaffirming *Totten* in unanimous decision). Even marshalling the evidence necessary to make the requisite showings would implicate privileged state secrets, because El–Masri would need to rely on witnesses whose identities, and evidence the very existence of which, must remain confidential in the interest of national security. *See Sterling*, 416 F.3d at 347 ("[T]he very methods by which evidence would be gathered in this case are themselves problematic.").

### b.

Furthermore, if El–Masri were somehow able to make out a prima facie case despite the unavailability of state secrets, the defendants could not properly defend themselves without using privileged evidence. The main avenues of defense available in this matter are to show that El–Masri was not subject to the treatment that he alleges; that, if he was subject to such treatment, the defendants were not involved in it; or that, if they were involved, the nature of their involvement does not give rise to liability. Any of those three showings would require disclosure of information regarding the means and methods by which the CIA gathers intelligence. If, for example, the truth is that El–Masri was detained by the CIA but his description of his treatment is inaccurate, that fact could be established only by disclosure of the actual circumstances of his detention, and its proof would require testimony by the personnel involved. Or, if El–Masri was in fact detained as he describes, but the operation was conducted by some governmental entity other than the CIA, or another government entirely, that information would be privileged. Alternatively, if the CIA detained El–Masri, but did so without Director Tenet's active involvement, effective proof thereof would require a detailed explanation of how CIA operations are supervised. Similarly, although an individual CIA officer might demonstrate his lack of involvement in a given operation by disclosing that he was actually performing some other function at the time in question, establishing his alibi would likely require him to reveal privileged information.

Moreover, proof of the involvement—or lack thereof—of particular CIA officers in a given operation would provide significant information on how the CIA makes its personnel assignments. Similar concerns would attach to evidence produced in defense of the corporate defendants and their unnamed employees. And, like El-Masri's prima facie case, any of the possible defenses suggested above would require the production of witnesses whose identities are confidential and evidence the very existence of which is a state secret. We do not, of course, mean to suggest that any of these hypothetical defenses represents the true state of affairs in this matter, but they illustrate that virtually any conceivable response to El-Masri's allegations would disclose privileged information.

c.

▇▇▇ It is clear from precedent that the "central facts" or "very subject matter" of a civil proceeding, for purposes of our dismissal analysis, are those facts necessary to litigate it—not merely to discuss it in general terms. In *Bareford v. General Dynamics Corp.,* several plaintiffs who had been injured or whose decedents had died in the 1987 missile attack on the U.S.S. Stark in the Persian Gulf initiated an action against the manufacturers of the vessel's weapons system, alleging that the system had been defectively manufactured and designed. *See* 973 F.2d 1138, 1140 (5th Cir.1992). Those allegations, like El-Masri's, could be set forth without revealing state secrets; the plaintiffs' assertion that a Navy weapons system was defective was not, in itself, detrimental to national security. The facts central to the resolution of the proceeding, however, were whether the weapons system was intended to destroy the missile that struck the Stark and, if so, why it failed. Those critical factual questions could not be answered, the Fifth Circuit concluded, without threatening disclosure of privileged state secrets, and thus dismissal was appropriate. *See id.* at 1143–44.

Similarly, in *Black v. United States,* the plaintiff alleged that, after he had reported suspicious contact with a possible Soviet spy, the CIA, FBI, Department of Defense, and Department of State had subjected him to a "campaign of harassment and psychological attacks." 62 F.3d 1115, 1116 (8th Cir.1995). Black claimed that employees of those agencies had followed him, subjected him to strange telephone calls, broken into his apartment and rearranged things, broken into his car, and drugged him with a substance that produced terrifying hallucinations. *See id.* at 1116–17. The general subject matter of those allegations, like that of El-Masri's Complaint, could be discussed without revealing state secrets. Yet the Eighth Circuit concluded that dismissal was appropriate because the facts central to the actual litigation of Black's claims—the "identity of the alleged wrongdoers, their relationship to the government, and their contacts with Black"—were privileged. *Id.* at 1118–19.

In *Kasza v. Browner,* the plaintiffs alleged that the Air Force had contravened the Resource Conservation and Recovery Act in its storage, treatment, and disposal of hazardous waste at a classified operating location near Groom Lake, Nevada. 133 F.3d 1159, 1164 (9th Cir.1998). Their allegations could be explained without resort to state secrets; the revelation that the Air Force might have unlawfully handled its hazardous waste was not detrimental to national security. But because much of the specific information needed to litigate the plaintiffs' claims was privileged, the Ninth Circuit concluded that the "very subject matter of [the] action is a state secret," and "agree[d] with the dis-

trict court that [the] action must be dismissed." *Id.* at 1170.

Our own recent decision in *Sterling* involved a CIA officer's claim that he had been discriminated against because of his race. *See* 416 F.3d at 341. As in the decisions of our sister circuits discussed above, Sterling's allegations could be stated with no detrimental effect on national security; his assertion that the CIA had engaged in race discrimination compromised no confidential information. Yet we concluded that the very subject matter of his action, the facts central to its litigation, consisted of state secrets, because a judicial resolution of the matter would have required disclosure of how the CIA makes sensitive personnel decisions, and would have involved the production of witnesses whose very participation in a court proceeding would risk exposing privileged information. *See id.* at 347–48. We thus affirmed the dismissal of Sterling's action at the pleading stage. *See id.* at 348–49.

■ In light of these decisions, we must reject El–Masri's view that the existence of public reports concerning his alleged rendition (and the CIA's rendition program in general) should have saved his Complaint from dismissal. Even if we assume, arguendo, that the state secrets privilege does not apply to the information that media outlets have published concerning those topics, dismissal of his Complaint would nonetheless be proper because the public information does not include the facts that are central to litigating his action.[5] Rather, those central facts—the CIA means and methods that form the subject matter of El–Masri's claim—remain state secrets. Consequently, pursuant to the standards that El–Masri has acknowl-

edged as controlling, the district court did not err in dismissing his Complaint at the pleading stage.

**2.**

■ El–Masri also contends that, instead of dismissing his Complaint, the district court should have employed some procedure under which state secrets would have been revealed to him, his counsel, and the court, but withheld from the public. Specifically, he suggests that the court ought to have received all the state secrets evidence in camera and under seal, provided his counsel access to it pursuant to a nondisclosure agreement (after arranging for necessary security clearances), and then conducted an in camera trial. We need not dwell long on El–Masri's proposal in this regard, for it is expressly foreclosed by *Reynolds,* the Supreme Court decision that controls this entire field of inquiry. *Reynolds* plainly held that when "the occasion for the privilege is appropriate, . . . the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers." 345 U.S. at 10, 73 S.Ct. 528. El–Masri's assertion that the district court erred in not compelling the disclosure of state secrets to him and his lawyers is thus without merit.

**C.**

In addition to his analysis under the controlling legal principles, El–Masri presents a sharp attack on what he views as the dire constitutional and policy consequences of dismissing his Complaint. He maintains that the district court's ruling, if affirmed, would enable the Executive to

---

**5.** By no means do we endorse El–Masri's theory that publicly reported information concerning his alleged rendition is ineligible for protection under the state secrets doctrine simply because it has been published in the news media. We need not address his contention in that regard, however, because his appeal would fail even if we were to accept it.

unilaterally avoid judicial scrutiny merely by asserting that state secrets are at stake in a given matter. More broadly, he questions the very application of the state secrets doctrine in matters where "egregious executive misconduct" is alleged, contending that, in such circumstances, the courts' "constitutional duty to review executive action" should trump the procedural protections traditionally accorded state secrets. Appellant's Br. 10.

Contrary to El–Masri's assertion, the state secrets doctrine does not represent a surrender of judicial control over access to the courts. As we have explained, it is the court, not the Executive, that determines whether the state secrets privilege has been properly invoked. In order to successfully claim the state secrets privilege, the Executive must satisfy the court that disclosure of the information sought to be protected would expose matters that, in the interest of national security, ought to remain secret. Similarly, in order to win dismissal of an action on state secrets grounds, the Executive must persuade the court that state secrets are so central to the action that it cannot be fairly litigated without threatening their disclosure. The state secrets privilege cannot be successfully interposed, nor can it lead to dismissal of an action, based merely on the Executive's assertion that the pertinent standard has been met.

In this matter, the reasons for the United States' claim of the state secrets privilege and its motion to dismiss were explained largely in the Classified Declaration, which sets forth in detail the nature of the information that the Executive seeks to protect and explains why its disclosure would be detrimental to national security. We have reviewed the Classified Declaration, as did the district court, and the extensive information it contains is crucial to our decision in this matter.

El–Masri's contention that his Complaint was dismissed based on the Executive's "unilateral assert[ion] of a need for secrecy" is entirely unfounded. It is no doubt frustrating to El–Masri that many of the specific reasons for the dismissal of his Complaint are classified. An inherent feature of the state secrets privilege, however, is that the party against whom it is asserted will often not be privy to the information that the Executive seeks to protect. That El–Masri is unfamiliar with the Classified Declaration's explanation for the privilege claim does not imply, as he would have it, that no such explanation was required, or that the district court's ruling was simply an unthinking ratification of a conclusory demand by the executive branch.

We also reject El–Masri's view that we are obliged to jettison procedural restrictions—including the law of privilege—that might impede our ability to act as a check on the Executive. Indeed, El–Masri's position in that regard fundamentally misunderstands the nature of our relationship to the executive branch. El–Masri envisions a judiciary that possesses a roving writ to ferret out and strike down executive excess. Article III, however, assigns the courts a more modest role: we simply decide cases and controversies. Thus, when an executive officer's liability for official action can be established in a properly conducted judicial proceeding, we will not hesitate to enter judgment accordingly. But we would be guilty of excess in our own right if we were to disregard settled legal principles in order to reach the merits of an executive action that would not otherwise be before us—especially when the challenged action pertains to military or foreign policy. We decline to follow such a course, and thus reject El–Masri's invitation to rule that the state secrets doctrine can be brushed aside on the

ground that the President's foreign policy has gotten out of line.[6]

### D.

 As we have observed in the past, the successful interposition of the state secrets privilege imposes a heavy burden on the party against whom the privilege is asserted. *See Sterling,* 416 F.3d at 348 ("We recognize that our decision places, on behalf of the entire country, a burden on Sterling that he alone must bear."). That party loses access to evidence that he needs to prosecute his action and, if privileged state secrets are sufficiently central to the matter, may lose his cause of action altogether. Moreover, a plaintiff suffers this reversal not through any fault of his own, but because his personal interest in pursuing his civil claim is subordinated to the collective interest in national security. *See id.* ("[T]here can be no doubt that, in limited circumstances like these, the fundamental principle of access to court must bow to the fact that a nation without sound intelligence is a nation at risk."); *Fitzgerald,* 776 F.2d at 1238 n. 3 ("When the state secrets privilege is validly asserted, the result is unfairness to individual litigants—through the loss of important evidence or dismissal of a case—in order to protect a greater public value").[7] In view of these considerations, we recognize the gravity of our conclusion that El–Masri must be denied a judicial forum for his Complaint, and reiterate our past observations that dismissal on state secrets grounds is appropriate only in a narrow category of disputes. *See Sterling,* 416 F.3d at 348; *Fitzgerald,* 776 F.2d at 1241–42. Nonetheless, we think it plain that the matter before us falls squarely within that narrow class, and we are unable to find merit in El–Masri's assertion to the contrary.

### III.

Pursuant to the foregoing, we affirm the Order of the district court. *See El–Masri v. Tenet,* 437 F.Supp.2d 530 (E.D.Va. 2006).[8]

*AFFIRMED.*

---

6. A group of former diplomats and State Department officials have submitted a brief in this matter as amici curiae. The amici emphasize that it is important, as a matter of foreign policy, to provide a forum for claims of civil and human rights violations. Even if we were to conclude, however, that protecting national security is less important than litigating the merits of El–Masri's claim, we are not at liberty to abrogate the state secrets doctrine on that basis.

7. It should be unnecessary for us to point out that the Executive's authority to protect confidential military and intelligence information is much broader in civil matters than in criminal prosecutions. The Supreme Court explained this principle in *Reynolds,* observing:

Respondents have cited us to those cases in the criminal field, where it has been held that the Government can invoke its evidentiary privileges *only* at the price of letting the defendant go free. The rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense. Such rationale has no application in a civil forum where the Government is not the moving party, but is a defendant only on terms to which it has consented.

345 U.S. at 12, 73 S.Ct. 528. El–Masri's reliance on our decision in *United States v. Moussaoui,* 382 F.3d 453 (4th Cir.2004), in which we required the United States to grant a criminal defendant substantial access to enemy-combatant witnesses whose very identities were highly classified, is thus misplaced.

8. On July 17, 2006, the United States filed a motion for expedited in camera/ex parte review of the Classified Declaration. By Order dated August 19, 2006, we deferred consider-

ation of that motion. We now deny the mo- tion as moot.