Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports.  Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 14, 2006　　　　Decided June 29, 2007
　　　　　　　　　　　　　　　　Unsealed July 20, 2007

No. 04-5313

IN RE: SEALED CASE

———

Appeal from the United States District Court
for the District of Columbia
(No. 94cv01756)

———

*Brian C. Leighton* argued the cause and filed the briefs for appellant.

*H. Thomas Byron III*, Attorney, U.S. Department of Justice, argued the cause for appellees.  With him on the brief were *Peter D. Keisler*, Assistant Attorney General, *Kenneth L. Wainstein*, U.S. Attorney at the time the brief was filed, and *Barbara L. Herwig* and *Douglas Letter*, Attorneys.

Before: ROGERS, BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

Concurring and dissenting opinion filed by *Circuit Judge* BROWN.

ROGERS, *Circuit Judge*: In this appeal, the court must decide whether the state secrets privilege requires the dismissal of Richard A. Horn's complaint alleging the violation of his Fourth Amendment rights. We affirm the district court's determinations that the United States properly invoked the privilege and that the complaint must be dismissed against one of the defendants. However, we hold that Horn can establish a *prima facie* case without using the privileged information. Accordingly, we reverse the dismissal of his complaint against the remaining defendant and remand the case to the district court to consider whether Horn's case can proceed.

## I.

According to the complaint, in 1993, Horn was stationed in Rangoon, Burma, as the country attaché for the United States Drug Enforcement Agency ("DEA"). He had a strained professional relationship with the State Department Chargé d'Affaires, Franklin "Pancho" Huddle, Jr., arising from the differing policy goals of their agencies, and he believed that Huddle was seeking information to justify Horn's transfer to another station outside of Burma. When Horn discovered that Huddle had sent a classified State Department cable allegedly transcribing a telephone call that Horn had made to a subordinate from his residence, he concluded that Huddle was engaging in electronic eavesdropping in violation of the Fourth Amendment.

In 1994, Horn filed a *Bivens*[1] action against Huddle and a second unnamed defendant ("Defendant II"), allegedly an employee of the Central Intelligence Agency ("CIA"), whose identity is classified. The United States intervened in 2000 and asserted the state secrets privilege with respect to portions of two internal investigations by agency inspectors general ("IG reports") that had been conducted in response to Horn's allegations. The district court sustained the claim of privilege. The government filed a classified motion to dismiss the complaint on November 7, 2000, and provided a redacted copy to Horn. Horn responded with a motion to proceed with discovery under the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. III, on November 13, 2000, deferring any response to the government's motion until the district court resolved his proposal to proceed under CIPA and his prior motion seeking security clearance for his attorney's secretaries.

Nearly four years later,[2] on July 28, 2004, the district court granted the government's motion to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(6) and dismissed Horn's outstanding motions as moot. The district court ruled that dismissal was required on three independent grounds: (1) the plaintiff cannot make out a *prima facie* case absent the protected material; (2) the state secrets privilege deprives the defendants of information required in their defense; and (3) the subject matter of the plaintiff's complaint is a state secret.

---

[1] *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Horn's complaint also alleged violations of anti-wiretapping statutes and conspiracy; these claims were dismissed in 1997. A putative class action filed by Horn was dismissed in 2000. Horn does not pursue these matters on appeal.

[2] The district court judge to whom the case was originally assigned died and the case was reassigned in 1999.

Horn appeals, and our review of the dismissal of his complaint is *de novo*. *See, e.g.*, *Broudy v. Mather*, 460 F.3d 106, 116 (D.C. Cir. 2006).

**II.**

The state secrets privilege "is a common law evidentiary rule that protects information from discovery when disclosure would be inimical to the national security." *In re United States*, 872 F.2d 472, 474 (D.C. Cir.), *cert. denied sub nom. United States v. Albertson*, 493 U.S. 960 (1989). It has "its initial roots in Aaron Burr's trial for treason, *United States v. Burr*, 25 F. Cas. 30 (C.C.D. Va. 1807), and has its modern roots in *United States v. Reynolds*, 345 U.S. 1 (1953)." *Id.* at 474-75. In *Reynolds*, the Supreme Court held that because the Federal Tort Claims Act ("FTCA") subjects the United States to liability only insofar as Congress has consented, and because the FTCA expressly incorporates the Federal Rules of Civil Procedure, the United States may claim a privilege against discovery of military and state secrets, pursuant to FED. R. CIV. P. 34, through a formal request "lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." 345 U.S. at 6-8 (footnote omitted). The Court observed that the "constitutional overtones" were "unnecessary to pass upon, there being a narrower [statutory] ground for decision." *Id.* at 6. In *Reynolds*, "[i]t [wa]s . . . apparent that the[] electronic devices [that were being tested in flight when the military airplane crashed and killed the plaintiffs' spouses] must be kept secret if their full military advantage is to be exploited in the national interests." *Id.* at 10. The Court remanded the case to proceed without the privileged materials, *id.* at 12, having noted that because the surviving crew members were available for examination, "it should be possible for [the plaintiffs] to adduce the essential facts as to causation without resort to material touching upon military secrets," *id*. at 11.

On appeal, Horn contends that the state secrets privilege may not be invoked in a *Bivens* action and, alternatively, that his case may proceed with non-privileged materials, including a declassified redacted cable and other circumstantial evidence suggesting that Huddle and Defendant II violated Horn's constitutional rights. We first address Horn's challenge to the application of the privilege in a *Bivens* action and his alternative contention that the United States did not properly invoke the privilege. Neither contention is persuasive.

**A.**

Unlike the plaintiffs in *Reynolds*, Horn does not rely upon the FTCA's limited waiver of sovereign immunity. As a result, he contends that the privilege is unavailable to the United States. Horn's complaint invokes *Bivens*, which provides that "damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials" notwithstanding the lack of an explicit statutory cause of action, 403 U.S. at 395-97. The district court ruled that it was "settled, indisputable law" that the Fourth Amendment protects American citizens abroad, *see, e.g.*, *United States v. Behety*, 32 F.3d 503, 510-11 (11th Cir. 1994); *United States v. Mount*, 757 F.2d 1315, 1317-18 (D.C. Cir. 1985), and the United States does not challenge that ruling on appeal.

The distinction pressed by Horn between constitutional claims and those based on statutory grounds means that *Reynolds*' holding on statutory grounds does not control. Nonetheless, it hardly follows that the privilege evaporates in the presence of an alleged constitutional violation. Horn identifies no legal authority to support this conclusion. Instead, the nature of the state secrets privilege compels the conclusion that the United States may claim the privilege as to evidence relevant to a constitutional claim. Even in constitutional cases, Congress "has plenary authority over the promulgation of

evidentiary rules for the federal courts." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 31 (1976); *see also Hawkins v. United States*, 358 U.S. 74, 78 (1958); *Tot v. United States*, 319 U.S. 463, 467 (1943). The federal rules of evidence provide that claims of privilege are to be "governed by the principles of the common law . . . in the light of reason and experience." FED. R. EVID. 501; *see United States v. Green*, 670 F.2d 1148, 1155 n.10 (D.C. Cir. 1981). In *Reynolds*, the Supreme Court made clear that "the privilege against revealing military secrets . . . is well established in the law of evidence." 345 U.S. at 6-7.

Although the rules of evidence must yield when they offend the constitutional trial rights of litigants, *see Tot*, 319 U.S. at 467; FED. R. EVID. 501, Horn identifies no trial right that is being abridged. In Horn's view, it is the constitutional nature of his underlying claim that entitles him to escape the binds of the federal rules. We can find no support for this position, which would essentially allow any constitutional claim to repress any rule that withholds evidence for reasons other than relevance, *see, e.g.*, FED. R. EVID. 403, 407, 411, 802. The federal rules are premised on a distinction between substantive claims and the evidence used to prove the claims. *Cf. Hanna v. Plumer*, 380 U.S. 460 (1965). Although evidentiary matters are governed by the rules, they cannot modify litigants' substantive rights as to either constitutional or statutory matters. *See* 28 U.S.C. § 2072(b); *cf. Webster v. Doe*, 486 U.S. 592, 603-04 (1988). Thus, so long as the state secrets privilege operates as a rule of evidence, *see Zuckerbraun v. Gen. Dynamics Corp.*, 935 F.2d 544, 546 (2d Cir. 1991); *In re United States*, 872 F.2d at 474, and not as a means to modify Horn's substantive constitutional rights, we hold that it may be invoked by the United States in a *Bivens* action. *See also El-Masri v. United States*, 479 F.3d 296, 300 (4th Cir.), *petition for cert. filed*, 75 U.S.L.W. 3663 (U.S. May 30, 2007) (No. 06-1613); *Black v. United States*, 62 F.3d

1115, 1117 (8th Cir. 1995); *Halkin v. Helms*, 690 F.2d 977, 987 & n.42 (D.C. Cir. 1982) ("*Halkin II*").

**B.**

Notwithstanding the deference due to Executive Branch claims of privilege, the Supreme Court instructed in *Reynolds* that the state secrets privilege is not to be "lightly invoked," 345 U.S. at 7, because, as this court has observed, once invoked, the privilege is "absolute" and "cannot be compromised by any showing of need on the part of the party seeking the information," *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 399 (D.C. Cir. 1984). Accordingly, this court has emphasized that the district court must scrutinize the claim of privilege more carefully when the plaintiff has "made a compelling showing of need for the information in question," *Ellsberg v. Mitchell*, 709 F.2d 51, 59 n.37, 61 (D.C. Cir. 1983), *cert. denied*, 465 U.S. 1038 (1984); *see Reynolds*, 345 U.S. at 11, and this court's review of the district court's determination that the "affidavits [are] adequate to establish the reasonable danger of injury," is for abuse of discretion, *Halkin II*, 690 F.2d at 991. To sustain the assertion of privilege, the district court need not have complete knowledge of how disclosure would cause a specific security breach, *see In re United States*, 872 F.2d at 475; it is sufficient that the reports present "a reasonable danger of divulging too much to a 'sophisticated intelligence analyst,'" *id.* (quoting *Halkin v. Helms*, 598 F.2d 1, 10 (D.C. Cir. 1978) ("*Halkin I*")). As the Supreme Court observed in *Reynolds*, where it is possible to determine "from all the circumstances of the case" that such danger exists, "the occasion for the privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers." 345 U.S. at 10.

The district court reviewed the unclassified declarations of then-Director of Central Intelligence George J. Tenet and then-Deputy Secretary of Defense John J. Hamre, which set forth their personal consideration of Horn's allegations and the national security interests involved, as well as additional classified declarations filed *ex parte* and *in camera*. The district court also requested the *ex parte*, *in camera* submission of the reports subject to the claim of privilege. On the basis of its review, the district court concluded that national security would be compromised if the portions of the IG reports for which the United States claimed a privilege were disclosed. Specifically, the district court found that releasing those portions of the IG reports would create the risk of revealing covert operatives, organizational structure and functions, and intelligence-gathering sources, methods, and capabilities.

Upon review of the IG reports and the affidavits submitted by the United States, we find no abuse of discretion by the district court in ruling that the United States has made the requisite showing as to the portions of the two IG reports over which the United States claimed privilege. Hence, these portions of the IG reports were properly stricken as evidence in the case.

**III.**

When the state secrets privilege is successfully invoked, "[t]he effect . . . is well established: '[T]he result is simply that the evidence is unavailable, as though a witness had died, and the case will proceed accordingly, with no consequences save those resulting from the loss of the evidence.'" *Ellsberg*, 709 F.2d at 64 & n.56 (quoting MCCORMICK'S HANDBOOK OF THE LAW OF EVIDENCE 233 (E. Cleary ed., 1972) and citing the advisory committee's note to PROP. FED. R. EVID. 509(d), 56 F.R.D. 183, 254 (1972), which "was rejected by Congress for

reasons unrelated to the Committee's recognition of th[is] principle"). Government participation in the case results in "no alteration of pertinent substantive or procedural rules." *Id.* at 64. In general, against a motion to dismiss, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1968 (2007), "construing the complaint liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged." *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006). In the context of the state secrets privilege, the court has recognized that where, as here, the plaintiff is not in possession of the privileged material, "dismissal of the relevant portion of the suit would be proper only if the plaintiff[] w[as] manifestly unable to make out a *prima facie* case without the requested information." *Ellsberg*, 709 F.2d at 65; *see also In re United States*, 872 F.2d at 476. We address each of the grounds on which the district court dismissed the complaint.

**A.**

The district court ruled that Horn could not make out a *prima facie* case without the use of privileged information. In many state secrets cases, a plaintiff has no prospects of evidence to support the assertions in his complaint and this lack of evidence requires dismissal. *See, e.g.*, *Ellsberg*, 709 F.2d at 65; *Halkin I*, 598 F.2d at 10-11; *see also El-Masri*, 479 F.3d at 308-09; *Kasza v. Browner*, 133 F.3d 1159, 1170 (9th Cir. 1998); *Bareford v. Gen. Dynamics Corp.*, 973 F.2d 1138, 1140-42 (5th Cir. 1992); *Zuckerbraun*, 935 F.2d at 547. Here, however, Horn is not without evidence. As the United States acknowledged through the Director of Central Intelligence, "[c]ertain documents appearing as joint report attachments [to one of the IG reports] and which contain little or no state secrets information can be segregated (in redacted or unredacted form, respectively) at no risk to U.S. national security." Tenet Decl.

¶ 33. Thus, although Horn cannot access the privileged portions of the IG reports, the question remains whether he can make out a *prima facie* case for a *Bivens* violation with the unprivileged evidence. At this stage of the proceedings, Horn must supply sufficient allegations that a federal agent, acting under color of his authority, violated his Fourth Amendment rights, but he need not disprove possible defenses. *See Bivens*, 403 U.S. at 389; *Ellsberg*, 709 F.2d at 68.

Horn's basic claim is straightforward: Late at night on August 12, 1993, he placed a phone call from his personal residence to a DEA subordinate, David Sikorra. He expressed concern that Huddle was trying to expel him from Burma and that DEA might respond by closing its Burma office. Soon thereafter, Horn learned of a cable, since declassified in part, that Huddle sent to State Department officials in Washington, D.C. This cable, which is dated August 13, 1993, contains an unclassified paragraph that reads:

> Finally, Horn shows increasing signs of evident strain. Late last night, for example, he telephoned his junior agent to say that "I am bringing the whole DEA operation down here." "You will be leaving with me . . . We'll all leave together." In this context, he then went on to note talks with [DEA officials] Greene and Maher without explicitly drawing a connection.

Cable from Franklin Huddle, American Embassy, Rangoon, Burma, to Secretary of State, Washington, D.C. ¶ 6 (Aug. 13, 1993) ("Huddle Cable") (ellipses in original). On the basis of this cable, which Horn claims quotes him verbatim, Horn concluded that someone was eavesdropping on his personal conversation with Sikorra.

In an unclassified and unprivileged affidavit submitted to the district court, Huddle insisted instead that Horn's conversation had spread by word of mouth. Huddle averred that he told the IG investigators that the information in the cable was provided to him by DEA Special Agent Bruce Stubbs. Special Agent Stubbs, for his part, denied, in the declassified portion of the IG report, telling anything to Huddle about Horn's conversation with Sikorra. According to unclassified and unprivileged information, Stubbs was on official travel during the relevant time period and told IG investigators that he neither saw Huddle in person nor contacted him by telephone. Stubbs insisted that he did not learn of Horn's conversation with Sikorra until he returned to Rangoon on August 26, 1993, almost two weeks after Huddle sent the cable to the State Department. Further, Stubbs swore in an unclassified and unprivileged affidavit that Huddle had contacted him while the IG investigation was pending to discuss how Stubbs had told Huddle about Horn's statement. Stubbs averred that he had no such recollection and that Huddle's telephone call was improper, to which Huddle responded that he was merely "prescreening [Stubbs] to determine [his] recollections of Horn's allegations." Stubbs Aff. para. 8. This aspect of Stubbs' affidavit is supported by a file memorandum that he wrote on September 22, 1994, the day after he was contacted by Huddle. When confronted with Stubbs' affidavit, Huddle told investigators in writing that he "stand[s] by [his] statement." Huddle Stmt. (Nov. 7, 1995).

Horn thus contends, in view of the unclassified and unprivileged materials, that he has demonstrated a *prima facie* case because the district court found that the redacted cable showed eavesdropping as the source of information, and the declassified interviews with personnel then stationed at the Embassy in Rangoon establish that Huddle did not learn of Horn's conversation, either verbatim or otherwise, from Stubbs or anybody else, leaving unconstitutional surveillance as the

only remaining option. Although Horn has no direct evidence that Huddle participated in an unlawful surveillance, he relies on the following circumstantial evidence:

First, in November 1992 there was a suspicious entry into his apartment in Burma when, unsolicited, his government-issued rectangular coffee table was swapped for an oval replacement while he was out of town. He was advised that his "original coffee table was needed to complete a sofa set at another residence." Memorandum from Richard A. Horn on Questionable Furniture Movement para. 3 (Feb. 27, 1995). Horn characterized this conduct as "peculiar" and notes that "[a] telephone was located in this room within close proximity to the aforementioned coffee table." *Id.* para. 4.

Second, Horn traces the limited spread among Embassy personnel of his conversation with Sikorra, emphasizing that Huddle's source was specific enough to allow Huddle to use quotation marks and ellipses in the cable. In declassified statements, Sikorra explained that he told only a secretary, Mary Weinhold, about the disturbing telephone call; Mrs. Weinhold explained that no one could have overheard her conversation with Sikorra and that she does not recall having told her husband, who also worked at the Embassy, about Horn's conversation; Mr. Weinhold corroborated his wife's recollection; and Huddle's deputy at the Embassy stated his belief that Huddle was aware of the conversation between Horn and Sikorra before he was.

The district court "verified that indeed, [the Huddle cable] is a <u>verbatim</u> reproduction of parts of Horn's conversation with Sikorra, using quotation marks and ellipses, and a paraphrasing of other parts — evidence that Horn's conversation had been wiretapped." Mem. Op. of Feb. 10, 1997, at 4. Nonetheless, the district court found Horn's allegations insufficient to establish

a *prima facie* case.  Mem. Op. of July 28, 2004, at 10.  The district court reasoned that Defendant II's identity is protected and that there is no unprivileged evidence connecting him to Horn's allegations.  As to both defendants, the district court concluded,

> [a]t most [Horn] has a dispute about whether or not [Huddle] learned the information from another person or from [unconstitutional surveillance].  But [Horn] cannot establish a *prima facie* case by offering any evidence that [surveillance] occurred.  Therefore, [Horn]'s case must be dismissed because [Horn] cannot establish a *prima facie* case against either defendant.

*Id.* at 10-11 (italics added).

As to Defendant II, the district court's reasoning is persuasive.  Nothing about this person would be admissible in evidence at a trial, so even construing the allegations in the complaint liberally does little for Horn's claim.  However, as to Huddle, we are unpersuaded that Horn could prove no facts that would lead a reasonable jury to conclude that Huddle had violated his constitutional rights.  Although Horn's case is premised on circumstantial evidence, "[a]s in any lawsuit, the plaintiff may prove his case by direct or circumstantial evidence."  *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983); *see also Doe v. U.S. Postal Serv.*, 317 F.3d 339, 343 (D.C. Cir. 2003).  Horn can point to the highly suspicious use in the cable of quotation marks and ellipses that creates an inference that the conversation has been transcribed, the seeming impossibility that Huddle would have learned of the conversation by lawful means, and the inconsistencies underlying Huddle's explanation about how he learned of the conversation.  Further, even if a reasonable jury found that Horn's conversation with Sikorra was gossip-worthy and might

have spread through the Embassy, it could still reasonably infer that eavesdropping had occurred from the following sentence in the cable, which appears less likely to have spread through office chatter: "In this context, he then went on to note talks with Greene and Maher without explicitly drawing a connection." Huddle Cable ¶ 6.

Against this proffer of evidence by Horn, the United States offers that "[Horn's] unsupported assertions [about eavesdropping] rely on hearsay concerning the [investigations by the] Inspectors General, and cannot be the subject of more proof because the contents of [portions of] the Inspector General reports are privileged." Appellees' Br. at 35 n.12. This argument fails for two reasons. First, to avoid dismissal of his complaint under FED. R. CIV. P. 12(b)(6), Horn need not plead the facts sufficient to prove his allegations and evidence that will ultimately be used at trial. *See Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 671 (D.C. Cir. 2005); *Warren v. District of Columbia*, 353 F.3d 36, 39-40 (D.C. Cir. 2004); FED. R. CIV. P. 8(a). Second, although the IG reports are privileged in part, the interviews Horn could rely upon, such as those with Embassy personnel, would involve conversations that have been declassified. As such, there would be no barrier to his calling the affiants as witnesses in order to testify to these unclassified matters, which are not subject to the state secrets privilege. Thus, even after evidence relating to covert operatives, organizational structure and functions, and intelligence-gathering sources, methods, and capabilities is stricken from the proceedings under the state secrets privilege, Horn has alleged sufficient facts to survive a motion to dismiss under Rule 12(b)(6).

**B.**

The district court also ruled that Horn's complaint must be dismissed because without the state secrets evidence the

defendants must proceed without materials they would need to mount possible defenses. As a general principle, privileged evidence is unavailable to either party, and neither party may rely upon the stricken evidence to its advantage. The Supreme Court in *Reynolds* thus admonished that the state secrets privilege is not to be "lightly invoked." 345 U.S. at 7. As Judge Learned Hand observed, a claim of the state secrets "privilege will often impose a grievous hardship, for it may deprive parties . . . of power to assert their rights or to defend themselves. That is a consequence of any evidentiary privilege." *United States v. Coplon*, 185 F.2d 629, 638 (2d Cir. 1950); *see also Northrop Corp.*, 751 F.2d at 399.

Notwithstanding the general rule that neither party may use privileged evidence, this court has allowed limited use to avoid the inequity caused when the United States asserts its privilege at the possible expense of a civilian defendant. Thus, in *Ellsberg*, the court suggested that qualified immunity may protect government officials against liability in this situation. 709 F.2d at 69 & n.74. Here, however, the district court rejected Huddle's claim of qualified immunity, reasoning that "Horn's allegations could constitute a violation of a clearly established constitutional right" and that "a jury could reasonably find clear and convincing evidence of defendants' unconstitutional motive." Mem. Op. of Feb. 10, 1997, at 17-18.[3] This court has

---

[3] Because the defendants in this case lack qualified immunity, our concurring and dissenting colleague suggests that the "'serious injustice' identified in *Ellsberg*" remains. Concurring & Dissenting Op. at 4. To the contrary, in *Ellsberg*, the court concluded:

> In sum, the practicability of *in camera* resolution of the immunity issue *eliminates* the possibility that the defendants — in this case or in future cases — will be trapped by the government's assertion of its state

also recognized that the excluded evidence may be used for the limited purpose of demonstrating a "valid defense." *In re United States*, 872 F.2d at 476; *accord Molerio v. FBI*, 749 F.2d 815, 825 (D.C. Cir. 1984). In *Molerio*, the court stated:

> As a result of th[e] necessary process, the court knows that the reason Daniel Molerio was not hired had nothing to do with [his father's] assertion of First Amendment rights. Although there may be enough circumstantial evidence to permit a jury to come to that erroneous conclusion, it would be a mockery of justice for the court — knowing the erroneousness — to participate in this exercise.

749 F.2d at 825. In distinguishing *Ellsberg*, where "the court's consideration of the state secrets privilege did not *ipso facto* disclose to the court the validity of the defense," the court in *Molerio* concluded that "further activity in this case would involve an attempt, however well intentioned, to convince the jury of a falsehood." *Id.* (italics added).

Therefore, when the district court can determine that the defendant will be deprived of a valid defense based on the privileged materials, it may properly dismiss the complaint. Other circuits have followed suit, relying upon *Molerio* to adopt the "valid defense" standard. *See, e.g.*, *Tenenbaum v. Simonini*, 372 F.3d 776, 777-78 (6th Cir. 2004); *Kasza*, 133 F.3d at 1166 (9th Cir.); *Zuckerbraun*, 935 F.2d at 547 (2d. Cir.); *cf. Bareford*, 973 F.2d at 1141 (5th Cir.). To the extent the Fourth Circuit

---

> secrets privilege. And that result, in turn, *alleviates any qualms* we might have concerning the result we reach today.

709 F.2d at 70 (emphasis added).

recently referred to "hypothetical defenses" based on privileged information in *El-Masri*, 479 F.3d at 309, its reference was made in the context of determining whether the "state secrets are so central to [the] proceeding that it cannot be litigated without threatening their disclosure," *id.* at 308, *see* Part III.C, *infra*; as relevant, the court reasoned that any valid defense to El-Masri's allegations of illegal detention and torture would require resort to privileged materials, *id*. at 308. Here, Huddle has already revealed his defense — that he learned of Horn's conversation through Stubbs — and it is unprivileged.

Although the district court found that Horn's complaint must be dismissed because there are possible defenses that Huddle cannot pursue without the resort to privileged materials, this is quite different from the finding in *Molerio* that the privileged materials showed that the defendant could not have committed the alleged acts. A "valid defense," as contemplated by this circuit's precedents, is meritorious and not merely plausible and would require judgment for the defendant. *See* BLACK'S LAW DICTIONARY 1586 (8th ed. 2004) (defining "valid" as "[l]egally sufficient" and "[m]eritorious"); *see also In re United States*, 872 F.2d at 481-82 (D.H. Ginsburg, J., concurring and dissenting) (agreeing with the court that "there is simply no reason why plaintiff cannot go forward with her claim" because "it is not at all clear that the Government's [secret] defense is dispositive (or even meritorious * * * under New York law)"). "Meritorious," in turn, means "meriting a legal victory," BLACK'S LAW DICTIONARY, *supra*, at 1010.[4]

---

[4] In other contexts, this court has consistently equated "valid" with meritorious and dispositive. In a criminal case, the court described a "valid defense" as one that "required acquittal." *United States v. DeFries*, 129 F.3d 1293, 1309 (D.C. Cir. 1997) (per curiam). In an exercise of pendent jurisdiction, the court observed that the statute of limitations is a threshold question because if it is a "valid

Under this court's precedent, a claim of state secrets privilege results in "no consequences save those resulting from the loss of the evidence," including "no alteration of pertinent substantive or procedural rules." *Ellsberg*, 709 F.2d at 64.[5] Were the valid-defense exception expanded to mandate dismissal of a complaint for any plausible or colorable defense, then virtually every case in which the United States successfully invokes the state secrets privilege would need to be dismissed. This would mean abandoning the practice of deciding cases on the basis of evidence — the unprivileged evidence and privileged-but-dispositive evidence — in favor of a system of conjecture. Just as "[i]t would be manifestly unfair to permit a presumption of [unconstitutional conduct] to run against" the defendant when the privilege is invoked, *see Halkin I*, 598 F.2d at 10, it would be manifestly unfair to a plaintiff to impose a presumption that the defendant has a valid defense that is obscured by the privilege. There is no support for such a presumption among the other evidentiary privileges because a presumption would invariably shift the burdens of proof, something the courts may not do under the auspices of privilege. *See* 28 U.S.C. § 2072(b).

---

defense," then the court need not reach other defenses. *Rendall-Speranza v. Nassim*, 107 F.3d 913, 916 (D.C. Cir. 1997). Simply put, a "valid defense" in a civil case "prohibits . . . recover[y]." *Graham v. Davis*, 880 F.2d 1414, 1418 (D.C. Cir. 1989).

[5] Our concurring and dissenting colleague notes that this portion of *Ellsberg* is dicta and thus not binding on this court. *See* Concurring & Dissenting Op. at 3-4. This citation to *Ellsberg* is limited to principles that the court described as so "well established" and "settled" to have been "taken for granted." 709 F.2d at 64 & nn.56 & 57 (quoting MCCORMICK'S HANDBOOK OF THE LAW OF EVIDENCE, *supra*, at 233)).

Our concurring and dissenting colleague would have the court replace this circuit's long-settled precedent, *see, e.g.*, *Molerio*, 749 F.2d at 825; *Ellsberg*, 709 F.2d at 64; *Halkin I*, 598 F.2d at 10, with a broader use of privileged evidence under an approach that considers the "distortion" effects of certain omitted defenses. *See* Concurring & Dissenting Op. at 6-7. Instead of understanding meritorious to mean "meriting a legal victory," our concurring and dissenting colleague seems to liken a meritorious defense to one that is merely potential or colorable. *See* Concurring & Dissenting Op. at 5-8. While suggesting that justice requires the court to withdraw from proceedings even where such defenses become unavailable, our colleague overlooks how this circuit's precedent has accommodated the interests of both plaintiffs and defendants. In suggesting that a defendant's interests require dismissing actions because of plausible but not demonstrably valid defenses, our colleague ignores how this would abridge the rights of plaintiffs and discounts how the fundamental rights of defendants are protected by dismissing cases when privilege obscures a valid defense that is likely to cause the trier of fact to reach an erroneous conclusion, *In re United States*, 872 F.2d at 476, or upon a legitimate claim of immunity, *Ellsberg*, 709 F.2d at 69. This accommodation is hardly "defendant-adverse." *See* Concurring & Dissenting Op. at 5. Faced with the opposite situation, where a plaintiff has proof of a defendant's liability that is inaccessible because of privilege, the courts are powerless to afford a remedy. And to the extent that our colleague is concerned that federal service will be burdened unless the court intervenes, *see id.* at 6, that concern has already prompted the court to strike an appropriate balance of interests by segregating the unprivileged from the privileged materials so a plaintiff may proceed and by allowing the limited use of privileged materials by the defendant for purposes of claiming immunity or a valid defense. *See Ellsberg*, 709 F.2d at 69.

Nor is it clear that the scales tip as our colleague suggests. The Executive Branch is well positioned to protect the incentives for federal service: it controls both the power to invoke the state secrets privilege and the discretion to indemnify an employee who is found liable for conduct that is taken within the scope of employment. *See* 22 C.F.R. § 21.1; *see also Ellsberg*, 709 F.2d at 69 n.74. Any non-pecuniary costs that may not be susceptible to indemnification are outweighed by the potential costs of a federal service that fails to protect its employees' constitutional rights. It bears remembering that the loss of evidence to the state secrets privilege is to be treated like the loss of evidence when "a witness ha[s] died." *Ellsberg*, 709 F.2d at 64; *accord Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1070 (9th Cir. 1995). The death of a witness, however, is not an occasion to dismiss complaints on the basis of speculation about what the lost evidence might have suggested. Where the United States has sufficient grounds to invoke the state secrets privilege and decides to invoke it, allowing the mere prospect of a privileged defense to thwart a citizen's efforts to vindicate his or her constitutional rights would run afoul of the Supreme Court's caution against precluding review of constitutional claims, *see Webster*, 486 U.S. at 603-04, and against broadly interpreting evidentiary privileges, for "[w]hatever their origins, . . . exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth," *United States v. Nixon*, 418 U.S. 683, 710 (1974).

Consequently, the district court may properly dismiss a complaint because of the unavailability of a defense when the district court determines from appropriately tailored *in camera* review of the privileged record, *Ellsberg*, 709 F.2d at 64; *see Reynolds*, 345 U.S. at 10, that the truthful state of affairs would deny a defendant a valid defense that would likely cause a trier to reach an erroneous result. Because the district court made no

finding that the existence of a valid privileged defense for Huddle precluded the continuation of Horn's case, its second ground cannot sustain the dismissal of Horn's complaint.

## C.

The district court further ruled that "the very subject matter of [Horn's] action is a state secret," therefore requiring dismissal of his complaint. Mem. Op. of July 28, 2004, at 11. In *Reynolds*, the Supreme Court acknowledged that there are cases "where the very subject matter of the action . . . [is] a matter of state secret." 345 U.S. at 11 n.26. The court referred to *Totten v. United States*, 92 U.S. (2 Otto) 105 (1876), where the Court affirmed the dismissal of a lawsuit surrounding a secret contract to perform espionage. In *Tenet v. Doe*, 544 U.S. 1, 8-9 (2005), the Supreme Court clarified that *Totten*, which eliminates actions that "depend[] upon the existence of [a] secret espionage relationship," performs a different function than *Reynolds*, which merely affects the evidence available. The Court explained that *Totten*'s core concern is with "preventing the existence of the plaintiff's relationship with the Government from being revealed." *Id.* at 10. Here, once Defendant II is dismissed from the case, the United States does not claim that secret agreements of this sort are implicated.

Horn's case presents no occasion for using the evidentiary privilege to eliminate substantive rights from the outset. In the past, the court has not looked favorably upon broad assertions by the United States that certain subject matters are off-limits for judicial review, *see In re United States*, 872 F.2d at 477, recognizing that "[d]ismissal of a suit, and the consequent denial of a forum without giving the plaintiff her day in court, . . . is indeed draconian," *id.*; *cf. Webster*, 486 U.S. at 603-04. In *Reynolds* itself, at the height of the Cold War, the Supreme Court remanded the FTCA case to proceed without the privileged materials. *See* 345 U.S. at 12. Horn's *prima facie*

case against Huddle relies, subject to the constraints of the state secrets privilege, upon the cable, the office chatter of Embassy personnel, and a *res ipsa loquitur* inference as to Huddle's source of information about Horn's conversation with Sikorra. *Cf. Barwick v. United States*, 923 F.2d 885, 886-87 (D.C. Cir. 1991). The national security concerns expressed by the Director of Central Intelligence in his unclassified declaration — i.e., revealing identities of covert officers, locations of facilities, organization of classified employees, and intelligence sources, methods and capabilities — are peripheral to what remains of Horn's prima facie case. The United States makes no claim that Horn has forfeited his constitutional rights by virtue of his overseas assignment with the DEA.

To the extent our concurring and dissenting colleague doubts that Horn's case can be litigated without compromising state secrets, the record does not support the broad statement that "the few unprivileged facts remaining are so entwined with privileged matters, and the risk of disclosure of privileged material so unacceptably high, that the very subject matter of this action is a state secret." Concurring & Dissenting Op. at 11. The declaration of the Director of Central Intelligence rejects the notion that all of Horn's lines of inquiry are inextricably interwoven. Whereas all discussion of intelligence sources, capabilities, and the like must be protected, the Tenet Declaration acknowledges that the remaining material — most notably the redacted cable and the IG interviews with Huddle and Embassy personnel — "can be segregated . . . at no risk to U.S. national security." Tenet Decl. ¶ 33. To dismiss Horn's complaint on the broad grounds favored by our colleague would be to adopt a "heads I win, tails you lose" approach to state secrets: whenever the plaintiff lacks information about his claim, the complaint must be dismissed for failure to make out a *prima facie* case, but as soon as any information is acquired, it becomes too risky to introduce the evidence at trial, also

necessitating dismissal. As our discussion reveals, neither the Supreme Court nor this court has adopted such an all-or-nothing approach.

Because the privileged material and the material comprising Horn's *prima facie* case are of a different ilk, our concurring and dissenting colleague's analogy to the law of the Fourth and Fifth Circuits, *see* Concurring & Dissenting Op. at 8-9, is inapposite. In *Bareford*, for example, the complaint alleged that a defense contractor had defectively manufactured and designed a military weapons system, *see* 973 F.2d at 1140. As the Fifth Circuit recognized, any trial would be about the operation and defects of the classified weapons system, which made it facially impossible not to discuss the classified details of the military secrets. *Id.* at 1144. In *Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236 (4th Cir. 1985), a claim of libel required the plaintiff to establish that he had not, contrary to a report in *Penthouse* magazine, published classified materials about experiments with dolphins that were used to design torpedoes. Fitzgerald needed to call an expert from the Defense Department in order to establish that the material was not classified. *Id.* at 1242. However, after an invocation of the state secrets privilege, the Fourth Circuit concluded that the case could not proceed because allowing testimony about what was not classified would inevitably allow the inference as to what was classified. *See id.* at 1243. Here, there is no claim that any of the unclassified Embassy gossip borders upon or is suggestive of classified materials — otherwise, it would not have been declassified and disclosed by the United States. By contrast, in *El-Masri* the Fourth Circuit dealt with sensitive details of the United States' program of extraordinary rendition for terrorism suspects and the legality of the very classified program covered by the claim of privilege, *see* 479 F.3d at 310-11. Finally, in *Farnsworth Cannon v. Grimes*, 635 F.2d 268, 281 (4th Cir. 1980) (en banc) (per curiam), the Fourth Circuit upheld the dismissal of a

contract case because the claim could not be adjudicated without reference to the organizational structure of a certain Navy component, which was classified.

In an apparent rush to judgment, our concurring and dissenting colleague misstates the position of the court as regards the consequences of state secrets evidence. *See* Concurring & Dissenting Op. at 7-8. If the plaintiff cannot establish a *prima facie* case, then the case must be dismissed. Horn, however, can establish a *prima facie* case without use of privileged materials. If the defendant proffers a valid defense that the district court verifies upon its review of state secrets evidence, then the case must be dismissed. The district court made no such finding and Huddle has pointed to no such defense on appeal. If the district court determines that the subject matter of a case is so sensitive that there is no way it can be litigated without risking national secrets, then the case must be dismissed. But the district court has not yet evaluated the case as it now stands and the Director of Central Intelligence suggests that further proceedings should be possible.

The court does not take lightly the issues of national security that Horn's complaint implicates. But at this juncture, it is premature to use our shared concern about the conduct of future proceedings to justify abandoning all attempts to resolve Horn's remaining substantive dispute. The district court analyzed the danger of proceeding to trial with reference to all of the allegations in Horn's complaint against both defendants. Upon removing Defendant II and the privileged portions of the IG reports and thereby limiting Horn's claims, the information that remains is, according to the Director of Central Intelligence, segregable from the privileged materials such that its disclosure entails "no risk" to national security. Tenet Decl. ¶ 33. Although witnesses in the trial proceedings, including Horn, will likely have had access to some classified materials in the course

of their federal employment in addition to the unprivileged materials that form the basis of Horn's remaining claim, there is no basis on this record for a presumption that a witness who has access to classified materials is unable to testify without revealing information that he knows cannot lawfully be disclosed in a public forum. District courts are well-positioned to resolve such concerns, as this court has recognized in emphasizing the obligation to disentangle sensitive information from non-sensitive information. *In re United States*, 872 F.2d at 476 (citing *Ellsberg*, 700 F.2d at 57); *see Reynolds*, 345 U.S. at 11. As such, there is no need to usurp this judgment from the district court as our concurring and dissenting colleague would prefer, *see* Concurring & Dissenting Op. at 11. It remains for the district court on remand to determine what procedures would be required to safeguard against disclosure of privileged materials and then to determine whether Horn's lawsuit can proceed. Were dismissal required based on the allegations now before this court — where Horn relies upon unclassified materials that the United States submits are unrelated to areas of national security sensitivity and Huddle has proffered no privileged valid defense — then federal government employees could unnecessarily be denied an opportunity to enforce their constitutional rights.

Accordingly, we affirm the dismissal of the complaint as to Defendant II but, because the grounds specified by the district court do not warrant dismissal of the complaint as to Huddle, we reverse and remand the case to the district court with instructions to reinstate the complaint against him. Nothing in this opinion forecloses a further opportunity by the United States to establish that privileged evidence demonstrates a valid defense for Huddle. Similarly, nothing in this opinion forecloses a determination by the district court that some of the protective measures in CIPA, 18 U.S.C. app. III, which applies in criminal cases, would be appropriate, as Horn urges, so that his case

could proceed. *See, e.g.*, *In re United States*, 872 F.2d at 479-80; *McGehee v. Casey*, 718 F.2d 1137, 1149 (D.C. Cir. 1983); *Ellsberg*, 709 F.2d at 64. We vacate the district court's order dismissing as moot Horn's motion regarding processing his secretaries for security clearance, and we have no occasion to address whether Horn or his counsel have a "need-to-know," *see* Exec. Order No. 13,292, § 61(z), 68 Fed. Reg. 15,315, 15,332 (March 25, 2003), additional classified information.

BROWN, *Circuit Judge*, concurring and dissenting:  I agree with the majority that the government properly invoked the state secrets privilege, the privilege applies in a *Bivens* action, and the district court properly dismissed Horn's complaint as to Defendant II.[1]  But we disagree about the proper legal standard for determining when application of the privilege requires dismissal. The majority's reversal of the district court's decision pushes this circuit's state secrets jurisprudence in a new and troubling direction — one at odds with all other circuits that have considered the issue.  Because, in my view, the district court reached the correct conclusion, I respectfully dissent.

I

After the government successfully invoked the state secrets privilege, the district court dismissed Horn's complaint on three independent grounds: (1) because Horn cannot make out a prima facie case absent the privileged material, (2) because the privilege deprives the defendants of information required in their defense, and (3) because "the very subject matter of plaintiff's action is a state secret."  Mem. Op. 8.  The majority approves the dismissal of Defendant II, but otherwise rejects the district court's conclusions on all three grounds.

As to the district court's first ground — Horn's ability to establish a prima facie case against Huddle absent the privileged material — I generally agree with the legal standard applied by the majority.  But I am less sanguine than the majority that the unprivileged facts actually suffice to make a prima facie

---

[1] The majority also properly assumes without deciding the important question of whether "the Fourth Amendment protects American citizens abroad," Maj. Op. 5, because the question is not squarely presented here.  While the district court in an earlier phase of this case did find the Fourth Amendment applicable, the government voluntarily dismissed its appeal of that ruling, and the issue was not litigated or briefed on this appeal.

showing. Once the privileged material is removed, Horn is essentially left with three pieces of circumstantial evidence — a cable, a table, and Huddle's apparent lie. I question whether a reasonable person would seriously entertain the possibility, based on that evidence alone, that Huddle learned of Horn's statement via a wiretap. One wonders if the atmosphere of government intrigue in this case — an atmosphere carefully cultivated by Horn and unfortunately only exacerbated by the government's invocation of the state secrets privilege — is in fact doing much of the work in the majority's determination that Horn has established a prima facie case on such skimpy evidence. Would a reasonable person really think Horn had established a prima facie case with the same circumstantial evidence if he was an OSHA inspector in Hoboken?

## A

But while I remain skeptical that Horn has a prima facie case once the privileged material has been removed, my fundamental disagreement with the majority relates to the controlling legal standard applicable to the district court's second and third grounds for dismissal. The majority does not expressly disagree with the district court's conclusion that, as a result of the invocation of the privilege, Huddle will be deprived of information necessary to mount an effective defense. Instead, relying on *Molerio v. FBI*, 749 F.2d 815 (D.C. Cir. 1984), and dicta from *Ellsberg v. Mitchell*, 709 F.2d 51 (D.C. Cir. 1983), the majority concludes dismissal is inappropriate unless the privileged material contains a defense so "dispositive" as to "require judgment for the defendant." Maj. Op. 17 & n.4.

To be sure, the privileged defense in *Molerio* was dispositive, and the court dismissed on that basis. But the court in *Molerio* merely determined that a dispositive defense is a *sufficient* basis for dismissal, not that a privileged defense *must be* dispositive for dismissal to be appropriate. *See Molerio*, 749

F.2d at 825. Because *Molerio* was the paradigmatic "easy case," it is unhelpful in establishing the proper standard for harder cases presenting less than dispositive, but nonetheless meritorious, defenses.

This is one of those harder cases, and the majority has responded by borrowing *Molerio*'s description of an extreme (and therefore easy) case to establish the new baseline for dismissal. In so doing, the majority relies extensively on speculative language from *Ellsberg* about the effect of the state secrets privilege on privileged defenses. *See* Maj. Op. 15–20. Thus, the majority purports to apply "long-settled precedent" in precluding all but dispositive privileged defenses. Maj. Op. 19. But as both the majority and dissent in that case recognized, *Ellsberg*'s sweeping comments about privileged defenses were dicta. *See Ellsberg*, 709 F.2d at 64 (noting that in light of its disposition, further discussion was not necessary to resolve the case, but that the court "consider[ed] it prudent to address briefly some of the problems the trial court will confront on remand"); *id.* at 73 (MacKinnon, J., concurring in part and dissenting in part) (characterizing the part of the *Ellsberg* opinion relied on by the majority here as "muddled dicta" presenting "novel procedures" that "I would be very surprised if the court on remand even attempted to apply" in light of a likely alternative resolution of the case); *see also Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821) ("[G]eneral expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.").

*Ellsberg*'s abstract discussion of privileged defenses is only controlling, therefore, to the extent it is persuasive. As the majority in *Ellsberg* itself recognized, the potential for "serious

injustice" arises when defenses are compromised by the government's invocation of the state secrets privilege:

> Deprived of the ability in practice to adduce the evidence necessary to mount a defense to the plaintiffs' *prima facie* case, the defendants could be held liable in damages for what in fact was wholly blameless conduct. Such a result not only would be patently inequitable, but might have an unfortunate long-run impact on the recruitment and behavior of government officials.

*Ellsberg*, 709 F.2d at 69 (footnote omitted). The *Ellsberg* majority speculated this "serious injustice" might be ameliorated by "recent developments" in the doctrine of qualified immunity. *Id.* But, as the majority here recognizes, the doctrine of qualified immunity does nothing for Huddle. Maj. Op. 15. We are thus left with the "serious injustice" identified in *Ellsberg*, without the supposed "way out of th[e] dilemma" envisioned by the *Ellsberg* majority. *Ellsberg*, 709 F.2d at 69. Dictum lacks binding precedential value precisely because abstract musings often fail to produce fully-considered legal rules. When "we accept dictum uttered in a previous opinion as if it were binding law, which governs our subsequent adjudication . . ., we fail to discharge our responsibility to deliberate on and decide the question which needs to be decided." Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. REV. 1249, 1250 (2006).

Indeed, perhaps recognizing the potential for "serious injustice" identified in *Ellsberg*, no other circuit has adopted the severe defense standard applied by the majority here. Few state secrets cases have been resolved on the defense prong. How to treat privileged defenses is an exceedingly difficult question, and most cases that have presented defense issues have been dismissed on other grounds. *See, e.g.*, *Bareford v. Gen. Dynam-*

*ics Corp.*, 973 F.2d 1138, 1143 (5th Cir. 1992). But the few circuits to address squarely the issue have not applied the defendant-adverse standard favored by the majority. *See, e.g.*, *El-Masri v. United States*, 479 F.3d 296, 309–10 (4th Cir. 2007) (dismissing in the alternative on the ground that "the defendants could not properly defend themselves without using privileged evidence"); *Tenenbaum v. Simonini*, 372 F.3d 776, 777 (6th Cir. 2004) (dismissing because "Defendants cannot defend their conduct with respect to [the plaintiff] without revealing the privileged information").

By equating a "valid" defense with a "dispositive" defense, and noting that "[o]ther circuits have . . . rel[ied] upon *Molerio* to adopt the 'valid defense' standard," Maj. Op. 16, the majority papers over the novelty of the defense standard it is applying. True, other circuits have referenced the "valid defense" standard, and cited *Molerio* in support, but it is not at all clear that in doing so they interpreted "valid" as meaning "dispositive," as opposed to "valid" as meaning simply "meritorious." *See* BLACK'S LAW DICTIONARY 1586 (8th ed. 2004) (defining "valid" as both "[l]egally sufficient" and "[m]eritorious"). Indeed, the Sixth Circuit in *Tenenbaum* — the only circuit actually to *apply* a "valid defense" standard — apparently meant the latter, since in dismissing the case, it stated only that "Defendants cannot defend their conduct . . . without revealing the privileged information," and made no suggestion that any of the defenses were dispositive. 372 F.3d at 777.[2]

---

[2] The majority also cites *In re United States*, 872 F.2d 472, 476 (D.C. Cir. 1989), for its discussion of the "valid defense" standard. *See* Maj. Op. 16, 19. The court in *In re United States*, however, had no occasion to apply any privileged-defense standard — certainly not the standard advanced by the majority. *See In re United States*, 872 F.2d at 482 (D.H. Ginsburg, J., concurring and dissenting) ("Here it is not at all clear that the Government's secret defense is dispositive

6

The majority's privileged-defense standard is troubling both in its sharp departure from the other circuits and in its potential effect on public officers. If a government officer accused of malfeasance has several meritorious — but not sure-fire — privileged defenses, those defenses are now simply irrelevant.[3]

The majority also completely ignores the potential for distortion when valid defenses are excised by invocation of the privilege. As Judge Phillips noted over a quarter-century ago, it is "important to keep in mind that by its very nature" the state secrets privilege "compromises the intrinsic fairness of the adversary litigation process which has been provided for formal dispute resolution" — for both plaintiffs and defendants alike. *Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268, 277 n.2 (4th Cir.) (Phillips, J., specially concurring and dissenting), *maj. op. rev'd per curiam*, *id.* at 281 (1980) (en banc). When application of the privilege so "compromises the intrinsic fairness" of a judicial proceeding — whether because it has removed too much

_____

(or even meritorious under New York law)." (alterations in original omitted)). In any event, any privileged-defense discussion in *In re United States* is irrelevant; unlike here, the government itself was the defendant in *In re United States*, and, "[i]n *Ellsberg*, this court made clear that a *government* party does not forfeit a meritorious defense merely because it would need to rely on privileged materials in order to assert it." *Id.* at 481 (emphasis added).

[3] The majority further states that "Huddle has already revealed his defense — that he learned of Horn's conversation through Stubbs — and it is unprivileged." Maj. Op. 17. Surely the majority cannot mean to imply that Huddle is limited to only *one* defense. As the majority is aware, the district court in a classified portion of its opinion recounted specific aspects of the privileged material Huddle would require to mount an effective defense at trial. Mem. Op. 11 (redacted). None of that material relates to Horn's disputed conversation with Stubbs.

information from the plaintiff's case or from the defendant's defense, or, as in this case, both — the right solution is not simply to muddle on, but rather "to withdraw from . . . litigants their normal right of access to the formal dispute resolution forum provided by the sovereign." *Id.* at 279. To permit a grossly distorted case — where the court knows the "facts" being litigated are only a parody of the real facts — to continue in our courts is not justice, and only invites injustice. *See id.* at 279 n.5 ("[Dismissal is appropriate] where the judge can sense that the actual dispute as defined by the issues so far differs from the dispute that could be litigated while honoring the privilege as to draw in question the fairness of attempting to apply to the restricted dispute the legal principles appropriate to resolution of the actual dispute.").[4]

## B

By stripping meritorious defenses from Huddle and leaving gaping holes in Horn's prima facie case, the invocation of the

---

[4] The majority argues that considering the "'distortion' effects of . . . omitted defenses . . . . abridge[s] the rights of plaintiffs," Maj. Op. 19, and "thwart[s] a citizen's efforts to vindicate his or her constitutional rights," *id.* at 20. Of course, that argument begs the very question that divides us: Do plaintiffs have a "right" to use the courts to press a case against a defendant when the available "facts" of that case no longer approximate reality? Ironically, it is the majority's unprecedented privileged-defense standard that creates "a system of conjecture," Maj. Op. 18, where fact-finders are forced to invent the missing parts of the story. The majority's standard, not mine, "impose[s] a presumption." *Id.* I am advocating a case-by-case assessment of how the privilege has affected the shape of the case being presented to the fact-finder, not "dismissal of a complaint for any plausible or colorable defense." *Id.* The majority, in contrast, is effectively establishing a presumption that plaintiffs able to make a prima facie showing deserve to prevail against defendants relying on meritorious privileged defenses, unless those defenses are dispositive.

privilege so distorts this case that dismissal is necessary. "[T]he undisclosable scope of privilege lies so completely athwart the scope of proof relevant to resolution of the issues presented that litigation constrained by administration of the privilege simply could not afford the essential fairness of opportunity to both parties that is a fundamental assumption of the adversary system." *Id.* at 279. Even assuming, however, that the majority remains indifferent to the distortion caused by the privilege, the district court's third ground for dismissal — that the "very subject matter" of Horn's action is a state secret — should be affirmed. The district court expressed concern that state secrets are "so central to the subject matter of [Horn's case] that any attempt to proceed will threaten disclosure of privileged matters." Mem. Op. 11–12 (quoting *Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236, 1241–42 (4th Cir. 1985)). The majority apparently disagrees, finding "national security concerns . . . peripheral to what remains of Horn's prima facie case." Maj. Op. 22.

In applying the "very subject matter" ground, other circuits have focused on the threat of inadvertent disclosure of privileged material posed by further litigation. *See Kasza v. Browner*, 133 F.3d 1159, 1170 (9th Cir. 1998); *Black v. United States*, 62 F.3d 1115, 1118 (8th Cir. 1995); *Bareford*, 973 F.2d at 1143; *Farnsworth Cannon*, 635 F.2d at 281 (en banc) (per curiam). Specifically, courts have considered the extent to which the non-privileged facts remaining in the case are intertwined with or surrounded by privileged material. *See, e.g.*, *Bareford*, 973 F.2d at 1143 (noting "the practical reality that in the course of litigation, classified and unclassified information cannot always be separated"); *Fitzgerald*, 776 F.2d at 1243 n.11 (explaining that "the merits of this controversy are inextricably intertwined with privileged matters"). Courts have expressed special concern where the plaintiff is in possession of some of the privileged material. *See Fitzgerald*, 776 F.2d at 1242 n.8;

*Farnsworth Cannon*, 635 F.2d at 281 (en banc) (per curiam). Similarly, they have recognized the risk of accidental disclosure where plaintiffs' cases depend on testimony from witnesses with personal knowledge of classified secrets "relevant to the subject matter of the litigation." *Fitzgerald*, 776 F.2d at 1242; *accord Bareford*, 973 F.2d at 1143–44. Courts have taken a practical approach, looking realistically at the "facts necessary to litigate" a plaintiff's case, "not merely [those necessary] to discuss it in general terms." *El-Masri*, 479 F.3d at 310–11 (collecting cases). As the Fourth Circuit has explained, "[t]he controlling inquiry is not whether the general subject matter of an action can be described without resort to state secrets. Rather, we must ascertain whether an action can be *litigated* without threatening the disclosure of such state secrets." *Id.* at 308.

This court has had no occasion to apply the "very subject matter" ground. But applying its logic to Horn's complaint leads inexorably to the conclusion reached by the district court. The few remaining unprivileged facts comprising Horn's prima facie case are islands surrounded by a sea of privileged material. This case is no different in that regard than *Farnsworth Cannon*, *Fitzgerald*, *Bareford*, or *El-Masri*, except that here the islands are fewer and smaller.[5]

Moreover, the majority's assertion that Horn "is not in possession of the privileged material" is mystifying. Maj. Op.

---

[5] The majority characterizes those cases as "inapposite," noting the centrality of the privileged information to each plaintiff's case. Maj. Op. 23–24. But this case is no different — here, the clearly "sensitive details," Maj. Op. 23, of Huddle's ability to conduct or order a wiretap are plainly central to Horn's case. And the allegations in Horn's complaint necessarily rely on the involvement of Defendant II; thus, dismissing Defendant II does not alter his centrality to Horn's case.

9. Horn clearly knows some of the privileged material, which the majority elsewhere implicitly concedes when it affirms the district court's dismissal as to Defendant II, noting "there is no unprivileged evidence connecting him to Horn's allegations." *See* Maj. Op. 13. Admittedly, because Horn has never seen the classified portions of the two agency investigative reports, he cannot precisely map the division between what portion of the information he knows is covered by the privilege, and what isn't. But that only exacerbates the potential for inadvertent disclosure, presenting the same problem identified by the Fourth Circuit in *Farnsworth Cannon*:

> [The ex parte] affidavit [delineating the privileged information] has not been seen by [plaintiff's] counsel, and without some disclosure of the affidavit to counsel, the trial lawyers would remain unaware of the scope of exclusion of information determined to be state secrets. Information within the possession of the parties on the periphery of the suppression order would not readily be recognized by counsel, unaware of the specific contents of the affidavit, as being secret or as clearly having been suppressed by the general order of the district court. In an attempt to make out a prima facie case during an actual trial, the plaintiff and its lawyers would have every incentive to probe as close to the core secrets as the trial judge would permit. Such probing in open court would inevitably be revealing.

*Farnsworth Cannon*, 635 F.2d at 281 (en banc) (per curiam).

Likewise, the majority suggests the unavailability of the privileged IG reports is of little consequence to Horn's case, because "there would be no barrier to his calling the [reports'] affiants as witnesses in order to testify to . . . unclassified matters." Maj. Op. 14. The majority is unconcerned that witnesses with relevant knowledge who might be called to

testify are also sure to possess privileged information relevant to Horn's case. Because the demarcation between the privileged and unprivileged information is by no means intuitive and, like Horn, the witnesses themselves would not be privy to the exact scope of the privilege, "the danger that witnesses might divulge some privileged material during [direct and] cross-examination is great." *Bareford*, 973 F.2d at 1144.

All of these considerations support the district court's third ground for dismissal. The majority comments that, at this stage of the proceedings, "Horn need not plead the facts sufficient to prove his allegations and evidence that will ultimately be used at trial." Maj. Op. 14. That is true; however, the government's invocation of the state secrets privilege in this case requires us to frankly consider whether Horn's case "can be *litigated* without threatening the disclosure of . . . state secrets." *El-Masri*, 479 F.3d at 308. Relying on the same case- and fact-specific approach favored by every other circuit that has considered the issue, and based on my review of the entire record *in this case*, I would find the risk of disclosure too great. Here, the few unprivileged facts remaining are so entwined with privileged matters, and the risk of disclosure of privileged material so unacceptably high, that the very subject matter of this action is a state secret.[6]

---

[6] The majority characterizes the declaration of the Director of Central Intelligence as "reject[ing] the notion that all of Horn's lines of inquiry are inextricably interwoven." Maj. Op. 22. But the declaration, which in the portion cited explains only that some potentially relevant evidence presents "no risk to U.S. national security" once segregated, says absolutely nothing about whether attempting to *litigate* a specific case involving that evidence might present an unacceptably high risk of disclosure. To state that specific pieces of evidence are unprivileged is obviously not tantamount to stating that any litigation involving that evidence could never run an unacceptable risk of disclosure of state secrets. The majority's attempt

12

II

This circuit's state secrets cases have predominantly turned on the first of the three grounds relied on by the district court in dismissing Horn's case.[7] The majority's disposition requires it to address all three grounds, but in doing so it gives short shrift to the important issues of distortion and disclosure. In my view, both of these issues are most effectively considered when analyzing whether the "very subject matter" of a case is a state secret. Thus, I would analyze the effect of invocation of the state secrets privilege as follows: First, can the plaintiff establish a prima facie case absent the privileged material? Second, if so, is a dispositive (i.e., *Molerio*-type) defense barred by the invocation of the privilege? Third, is the very subject matter of the case a state secret? In evaluating this final prong, I would consider the issues of distortion and disclosure: Has removal of facts relevant to the plaintiff's prima facie case or the defendant's defense, or both, so distorted the case that the litigation no longer even approximates reality? And does further litigation threaten inadvertent disclosure?

While I find this framework helpful, another might work equally well. The problem with the majority's approach is its elevation of the rhetoric of perfect justice over the realities of distortion and disclosure. The question is not whether we like or approve of the state secrets privilege. It exists. The question is how the existence of the privilege, properly invoked, reshapes the case. In reversing the district court's conclusion that the

to wrest the latter implication from the declaration far exceeds that document's purpose and scope.

[7] *Molerio* turned on the second ground, but, as noted, *Molerio* was an easy case presenting a clearly determinative privileged defense. *See* 749 F.2d at 825.

very subject matter of Horn's case is a state secret, the majority rejects the standard consistently used by other federal courts and fails to offer any alternative.[8]   To make matters worse, the majority announces a new and troublingly high threshold for dismissal when invocation of the privilege compromises the defenses of government officials.

I respectfully dissent.

---

[8] The majority comments "there is no need to usurp . . . from the district court" the judgment of whether the very subject matter of Horn's case is a state secret.  Maj. Op. 25.  Yet that is exactly what the majority has done, explaining that "the district court has not yet evaluated the case *as it now stands*."  Maj. Op. 24 (emphasis added).  But the case "as it now stands" is no different than the case the district court dismissed except the majority has put Huddle back in.   In dismissing Horn's entire case, the district court certainly considered whether an action against Huddle alone risked disclosure of state secrets, stating that "[a]t the *heart* of plaintiff's claim is . . . information that is at the center of the state secrets privilege" and that "*any* attempt to proceed will threaten disclosure of privileged matters."  Mem. Op. 12 (emphases added) (citation omitted).